**STATE of Minnesota, Respondent,**

v.

**Stanley CERMAK, Appellant.**

**No. CX–82–1225.**

Supreme Court of Minnesota.

April 5, 1985.

Mary Wertz, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, R. Kathleen Morris, Scott County Atty., Shakopee, for respondent.

WAHL, Justice.

█ Defendant was charged with five counts of criminal sexual conduct in the first degree and five counts of criminal sexual conduct in the second degree for sexually penetrating five of his grandchildren on July 16, 1981. A district court jury found defendant guilty as charged. The trial court sentenced defendant to five consecutive 45-month prison terms (225 months).[1] On this appeal from judgment of conviction, defendant contends (1) that several of his convictions should be reversed outright because the evidence was legally insufficient and (2) that as to the other charges he should be given a new trial because (a) evidence of prior misconduct was admitted without defendant having received a *Spreigl* notice, (b) testimony by an expert that incest was intergenerational in character was improperly admitted, and (c) defendant's trial counsel failed to represent him effectively. We affirm.

This is one of four appeals to come before us in connection with the prosecution and conviction of members of the Cermak family. Others are *State v. (Alice) Cermak*, 365 N.W.2d 243 (Minn., filed herewith); *State v. (James) Cermak*, 350 N.W.2d 328 (Minn.1984); and *State v. (John) Cermak*, 344 N.W.2d 833 (Minn. 1984). The prosecutions were based on the results of an investigation that ultimately revealed the existence of a conspiracy by defendant, his wife Alice, their sons James and John, and the sons' wives Beverly and Jillayne, to sexually abuse the children in the family. Typically, the abuse—which was ongoing—occurred during the playing of a "game," which involved one or more of the adults getting several of the children together and ordering the children to participate in various sex acts with the adults and with the other children.

This particular prosecution is based on evidence that defendant participated in playing the "game" in the Belle Plaine trailer house of James and Beverly Cermak on July 16, 1981, the day they were moving to New Prague. Participants in the game on that day were defendant and Alice, James and Beverly, John and Jillayne, and five children—three girls and two boys—ranging in age from 9 down to 3. Evidence of defendant's participation included the following:

(a) Jillayne Cermak, who pleaded guilty to the charges against her and agreed to testify for the state in return for probation, testified that each adult sexually penetrated each child and that she specifically recalled seeing defendant penetrate the rectums of the two older girls with his penis.

(b) Beverly Cermak, who also pleaded guilty as part of an identical plea agreement, testified that she recalled seeing defendant put his finger in the rectum of the

---

1. The presumptive sentence for criminal sexual conduct in the first degree (a severity level VIII offense) by a person with defendant's criminal history score (zero) is 43 months in prison, with the permissible range of deviation without departing being 41–45 months. Consecutive sentencing was permitted without departing, since there were five different victims. Minnesota Sentencing Guidelines and Commentary II.F.06 (1984); *State v. (James) Cermak*, 350 N.W.2d 328 (Minn.1984); *State v. Wellman*, 341 N.W.2d 561 (Minn.1983).

The judgment papers in the file indicate that defendant was adjudged guilty of five counts of criminal sexual conduct in the first degree and five counts of criminal sexual conduct in the second degree. However, defendant does not make any argument with respect to the applicability of Minn.Stat. § 609.04 (1984). *See State v. (James) Cermak*, 350 N.W.2d 328, 334 (Minn. 1984) (vacating some convictions on this ground). Further, there is a paper in the file—a page from a legal pad with handwriting on it—that indicates that the trial court dismissed the five counts of criminal sexual conduct in the second degree. In his argument on the sufficiency of the evidence, defendant argues that 8 of the *10* convictions should be reversed. If there is any doubt about this matter, defendant may obtain relief pursuant to section 609.04 in the district court.

younger of the boys on the day in question and put his lips on the vaginas of two of the girls.

(c) The oldest of the girls, who was 10 at the time of defendant's trial, testified that the men, including defendant, wore condoms and sexually penetrated her rectum.

(d) The next older girl, who was 9 at the time of defendant's trial, testified that defendant played the "game" on moving day.

(e) Vicki Luoma, the attorney who represented John Cermak, testified that defendant expressed irritation to her that Beverly's father did not help out on moving day.

Defendant denied participating in any of the sexual abuse of the children and denied that he was present at the trailer on moving day. Other witnesses were called by defendant to corroborate his testimony, but one of them, a boy who lived in the trailer court and was the victim of sexual abuse by John and James Cermak, surprised the defense by testifying that he saw defendant at the trailer court on moving day.

1. Defendant argues (a) that it was improper to convict him of sexually abusing the older of the two boys because the boy did not testify (he was ruled incompetent) and no one specifically recalled who sexually penetrated him, and (b) that the convictions based on the penetration of all but the oldest child must be vacated pursuant to Minn.Stat. § 634.04 (1984) because those convictions were based solely on the uncorroborated testimony of Beverly and Jillayne, both accomplices to the crimes.

■■■■ These two contentions are without merit. A defendant can be convicted of sexual abuse or rape even if the victim does not testify. *Cf. State v. Ellert,* 301 N.W.2d 320 (Minn.1981) (affirming an assault conviction in a case in which the victim testified at trial as a witness for the defense rather than for the state). Further, under Minn.Stat. § 609.05 (1984), a defendant can be convicted of sexual abuse or rape even if he himself did not touch the victim, provided that the defendant aided or advised in the commission of the offense. The record in this case does not clearly

establish that defendant himself sexually penetrated each of the five children on the date in question but does contain (a) testimony by two accomplices that all of the children were sexually penetrated, (b) testimony by two accomplices that defendant actively participated in the offenses, (c) the victims that defendant played the "game" on the day in question, and (d) other evidence placing defendant at the scene that day. This evidence was sufficient to sustain the determination that defendant either sexually penetrated or intentionally aided in the sexual penetration of all five children.

2. Defendant makes three arguments in support of his contention that he is entitled to a new trial:

(a) First, he argues that the evidence of prior crimes was admitted without his having been given a *Spreigl* notice. This evidence consisted of testimony of Beverly and Jillayne that the sexual abuse of the children—the playing of the "game"—had been going on for a number of years and that defendant not only was an active participant in the game but one of its "inventors." The state responds that the issue of whether *Spreigl* notices should be served was discussed by the court and the attorneys before trial and it was agreed that *Spreigl* notices were unnecessary because defense counsel was aware of the prior offenses through discovery. Defendant, in his reply brief, does not dispute this but argues that although he had the information, which was also referred to in the police reports attached to the complaint, he did not have notice of the state's actual intent to introduce the evidence.

■■■ Defendant has not established the need for a new trial on this ground. In *State v. Volstad,* 287 N.W.2d 660 (Minn. 1980), the issue was whether it was error to admit evidence of one of the defendant's prior crimes against the victim, his estranged wife, because of the lack of a *Spreigl* notice. We said that there were three "answers" to the defendant's contention:

First, defendant did not specifically raise the issue at trial; second, the incident was specifically mentioned in the complaint, so the defendant was aware that the complainant claimed it had occurred; and third, the incident really was a part of a broader incident, for which a *Spreigl* notice was given.

287 N.W.2d at 662.

In this case defense counsel waited until the end of trial to object to the *Spreigl* evidence on this ground, admitting that he should have objected earlier. Even more importantly, it would have been useless for defense counsel to object. He was fully aware of the evidence of the prior misconduct and should have known that the state would offer it at trial since it put the present charges in context. If defense counsel had objected, the court would have asked him how defendant was prejudiced by not having received formal notice, and defense counsel presumably would not have been able to show prejudice.

(b) Defendant next argues that testimony by an incest expert that incest tends to be intergenerational was improperly admitted. The expert, Dr. Lorna Anderson, was called by the defense in an attempt to discredit the testimony of Beverly Cermak, to whom the doctor had administered a Minnesota Multiphasic Personality Inventory (MMPI). On cross-examination the following exchange occurred:

Q. Would you explain to the jury, just generally, and I will let you do what you think—

A. Umm-hmm.

Q. —why you consider yourself an expert and what you have done in the field?

A. I have worked with literally all types of families, I think basically because I got interested in this program and because there was not anybody else to do it at the time.

It came up as a request from Ramsey County for child protection, they didn't know how to treat these families, so I arranged to treat them and also did research including tests and evaluations of offenders, their spouses and the children in the family, and I have been doing that, I believe, since 1972 in a wide variety of settings. I have done research, I have also done what we call a demographic study in Ramsey County of the characteristics of the offender, of the victim, and of the spouse. I have published that in 1978 or 1979. It is a study of character disorders and what it refers to is what I had found, so that everybody involved in incest families has some flaw of conscience and has a great many characteristics of guilt including the fact that they are all victims, that includes the offender. *I found that whole pattern of abuse is one that is repeated from one generation to the next. It is very sad, it is kind of like an illness, or a cancer that is passed on in the family, with victims becoming offenders, becoming victims and creating more offenders and creating more victims, and it will go on and on until it is stopped. I think that is the thing that has impressed me most.* As I indicated, I am currently doing some research on long term effects of this on adults in the experience with children. We have found some ways of working with these people, we have found that it is best to treat both the victim and the offender to stop this progression of the disease from generation to generation. I am currently working with both victims and the offender. I have found that people do not learn how to molest kids unless they, themselves, have been molested. In my experience, almost 95% of offenders have been molested. I have found that it is impossible to do treatment in this area without court involvement. In other words, if a person is not helped through treatment, they simply will not follow through.

They have to be impressed somehow of the gravity of what they are doing because within their psychology and philosophic system, it is okay, anything that they do in this area is okay, and that attitude can pass on to generation after generation and, as I said, unless it is

stopped, and the only way I know to stop it is to somehow get court involvement and then do some kind of treatment through a program and by modifying their attitudes so it does not go on and on with other generations, and the kids have to be in therapy and the parents have to be in therapy and we have to impress them all with their responsibilities in this area.

Q. And so what you have done is to draw this to the attention of the public in generation after generation after generation?

A. Yes.

Q. And to tell us what incest is all about?

A. And the public doesn't know. I am appalled at that. I would certainly, given an opportunity, talk about it in some way.

MR. ORTH: I object to Dr. Anderson's examination. It is beyond the scope of the direct.

THE COURT: The objection is sustained.

(Emphasis added). Defendant did not object to this evidence in a timely manner, move that it be stricken or seek a curative instruction. Instead, on direct examination of defendant, defense counsel asked defendant if he was molested as a boy and defendant said no. Then on cross-examination, without objection, the prosecutor asked defendant if Alice, his wife, was abused as a child and defendant said no. The prosecutor, over objection, was permitted to question defendant about whether Alice's father was sexually abusive of children and animals. On rebuttal the prosecutor, without objection, elicited evidence that defendant had told Vicki Luoma, who represented John Cermak, that Alice's father was sexually abusive of children and animals.

On appeal defendant focuses our attention on the testimony of Dr. Anderson that incest tends to be intergenerational. He argues that the evidence was lacking in foundation, that it was outside the proper scope of cross-examination, and that any probative value was substantially out-weighed by the evidence's potential for unfair prejudice.

Recently, in *State v. Myers*, 359 N.W.2d 604 (Minn.1984), we upheld the admission in a case of child sexual abuse of qualified expert testimony describing the psychological and emotional characteristics typically observed in sexually abused children and those observed in the complainant in that case. We also upheld the admission of opinion testimony by the expert that the complainant's allegations were truthful, because the defendant had "opened the door" to the subject by discrediting the child's credibility by showing that her mother did not believe her for several months.

■■■ Expert testimony that incest is intergenerational in character differs from evidence of the kind discussed in *Meyers*, particularly where it is offered for the purpose of connecting a particular defendant to the crime by showing that he also was the victim of sexual abuse as a child. *State v. Loebach*, 310 N.W.2d 58 (Minn. 1981)(barring admission in child abuse case of evidence of battering parent syndrome, including evidence that the defendant, like most battering parents, was himself abused as a child). The testimony in this case, however, was not offered for the purpose of connecting the defendant to the crime or to establish his guilt by showing that he also was the victim of sexual abuse as a child. Dr. Anderson was called by the defense for the purpose of impeaching the credibility of Beverly Cermak. It was Dr. Anderson's testimony on direct examination that there was an elevation on the L or lie scale of the MMPI taken by Beverly Cermak. The state's cross-examination was properly directed to obtaining further information on how Dr. Anderson's expertise could be used to interpret the scale and to explain the test results. Furthermore, defendant did not object to this particular expert testimony. Rather, he sought to counter the evidence by showing that he had not been molested as a child. It is arguable that the defendant's elicitation of evidence that he had not been sexually abused as a child did not justify the prose-

cutor in eliciting the evidence about defendant's father-in-law. However, we need not decide that point because it is clear that any error in eliciting the evidence was non-prejudicial in view of the overwhelming evidence of defendant's guilt.

■ (c) Defendant's final contention is that his trial counsel failed to represent him effectively. This contention must fail. The record indicates that defendant was adequately represented at trial by privately retained counsel of his own choice. Beyond that, he has not established that he was prejudiced by any of his counsel's alleged mistakes.

Affirmed.